# Kelly *versus* City of Pittsburgh.

By the Act of April 6th 1867 the territorial limits of the city of Pittsburgh were extended and thereby embraced within its boundaries certain lands used only for farming purposes. These lands were taxed for municipal objects, from some of which, on account of the situation of the lands, they could not derive any benefit or receive any protection. *Held*, AGNEW, C. J., and STERRETT, J., dissenting, that this tax was constitutional.

October 4th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Appeal from the decree of the Court of Common Pleas, No. 1, of *Allegheny county :* Of October and November Term 1876, No. 172. In Equity.

The case was first argued on the 30th of October 1876, and this re-argument was subsequently ordered of the court's own motion.

It was a bill in equity, filed the 15th of August 1874, by James Kelly, against the city of Pittsburgh, to restrain said city from taxing the farm of plaintiff for city purposes, from which it derived no benefit, on the ground that such attempted exercise of the taxing power was in conflict with sect. 10, art. 1, of the Declaration of Rights of the Constitution of Pennsylvania. The bill, in substance, set forth, that plaintiff is the owner of a farm of 80 acres of land within the consolidated limits of the city of Pittsburgh ; that the city, with the single purpose of increasing her revenues, and without any pretext of extending any municipal benefit of any kind to plaintiff, and against his will, through the aid of a portion of the citizens living in the new district, was instrumental in procuring an Act of the legislature (Act of April 6th 1867, Pamph. L. 846), extending the territorial limits of the city over and beyond his farm, with full knowledge that it was an improved farm, occupied by the owner as fields, pasture and woodlands, situated and adapted to farming or agricultural purposes only, and had always heretofore, and since, been used as such ; that the said lands had never, nor have they as yet, been laid off in lots, streets or avenues, or city improvements of any kind made thereon, nor are they used or needed in any way for city purposes ; that the city has not filled up her original limits, but that large quantities of vacant lands lie between the plaintiff's said lands and the inhabited portions of said city, and consequently the natural growth and developments in extension of said city have not, and the plaintiff believes will not for a generation to come, need or require any portion of the plaintiff's said lands for city purposes to accommodate her increasing population ; that not one single city improvement, convenience, protection, regulation, water facility, road or street convenience, protection from fire, drainage, light or schools has been bestowed on said lands ; that the plaintiff's farm, improved and now occupied as aforesaid, has received no benefits from the city whatever, and can derive none ; that the city has never

[Kelly v. City of Pittsburgh.]

expended a dollar to enhance the value of the plaintiff's farm; nor does the plaintiff expect or require anything, as his farm is not needed for city purposes; that plaintiff has not himself appropriated his said lands to town or city purposes; has not laid them off into parcels or lots; has not opened streets thereon, nor invited nor held out inducements to any one to purchase, or settle on the same, for he does not wish so to sell, but to retain the same for his own use, and not divert it to any other purpose than as a farm; and until the natural growth and multiplication of numbers and extension, and reasonable business of the city shall require the use of his said farm for city purposes, he denies the right of the city to invade or interfere with his said premises, or require him to abandon the rural use thereof; that by the extension of the city territorial limits the character, situation and use of said lands were not changed, but remained an improved and occupied farm as before, and agricultural lands only, and therefore are not, in any sense, liable to municipal or city taxation for any purpose whatever; that, notwithstanding these facts, his said farm, and the few necessary improvements thereon, have been returned at an assessed value of $244,000, and the city has levied a tax thereon amounting to $2672.48 for the year 1874; that the greatest productive income or value of his said farm is $10 per acre, or $800 for the whole; of this sum $428.47 was paid for county and state taxes, the balance, $371.53, mainly required for necessary repairs, leaving said city taxes unpaid by any income or productive value of said farm, and which can only be paid by taking the farm or a portion thereof; that, if the said city is permitted thus to deprive him of his individual property through the taxing power, it is forcing him to surrender his property for the benefit of others; that no compensation has been given, none promised and none intended; that such exercise of the taxing power would be confiscation; that the attempt of the city to force city revenue for the purpose of making municipal improvements, not one of which has been extended or can be extended to plaintiff's land, is directly in conflict with the rights of plaintiff, guarded and protected by section 10, article 1, of the Declaration of Rights of the Constitution of Pennsylvania, which protection he invokes; that plaintiff applied to the Board of Revision for relief, and that his appeal was dismissed; that shortly after the Act of Consolidation extending the limits of the city of Pittsburgh, said city had some surveys made, fixing her boundaries and designating where streets might at some future day be made; and in this way plaintiff is informed and believes defendant surveyed his said lands, but with no intention at the time of occupying the same for city purposes or of making city improvements, for they are not required or needed for that purpose, and will not be for fifty years to come; and the plaintiff submits that this nominal exercise of municipal jurisdiction, unconnected

[Kelly *v.* City of Pittsburgh.]

with any protection or benefits, is not such an appropriation as justifies taxation for municipal benefits from year to year, when none of said improvements or benefits extend to .or near the plaintiff's land; that said city is threatening to enforce the collection of said taxes, and, if not restrained, great injury and wrong will be done to said plaintiff.

The bill prayed that an injunction should be issued, restraining said city from again assessing or taxing the plaintiff's lands or farm, or from exercising any municipal jurisdiction over the same for raising city revenue, as long as said lands or farm shall be as they are in fact, farm or agricultural lands, and appropriated to such purposes.

The answer averred that said land, with the other portion· of the city in that neighborhood, was laid off in streets and avenues by councils, by a plan approved in 1870; that immediately adjoining the south side of plaintiff's property squares of ground have been laid off in small lots, and dwelling and store-houses erected upon them; that plaintiff's land has the advantage of.Frankstown Avenue, which has been graded and paved with wooden pavement to within a short distance of it; of Spencer Avenue, which has been graded, and runs along a portion of the north side of said land; of streets and avenues, graded and paved, running within a short distance of three sides of complainant's said land; of the city police, stationed in the immediate neighborhood; of water and gas, which run along Penn Avenue and within a stone's throw of complainant's land; of the New Water Works, now in course of construction; and of all the benefits and protection afforded to life and property by the municipal government; that the consolidation of 1867, under which complainant's property was brought into the city, has and will be for the benefit of the citizens of the annexed districts, including the complainant, and has and will appreciate the value of their property, including the said land of the complainant.

The bill and answer were referred to a master, T. McConnell, Esq., to take testimony and report. In the facts found by him it appeared that the land remained substantially in the same situation as it was before the consolidation; that gas had not been extended to it, nor were the streets paved thereto; that the land was sufficiently watered by springs and wells thereon, and there was no need for the water from the city works; that there was no necessity for streets through the same, as the old roads afforded ample accommodation; that the fire department could not be made available on the land, and that no police visited the localities. He reported further :—

"Mr. Kelly does not want streets opened to or through his land; or to have them graded or paved, and he does not want water or gas. He desires to use his land as a farm, and to apply it to no city purpose. He alleges that for farming purposes his land needs no city improvements, and therefore it ought not to be taxed for them. He asks nothing from the city, and he wants it to ask nothing

[Kelly v. City of Pittsburgh.]

from him. He asks exemption from taxation for city purposes, on the ground that he is not interested in the objects to which the taxes are to be applied, and therefore gets nothing in return for the taxes. Mr. Kelly's land was, up to consolidation, in close proximity to the city. Its value, therefore, depended on the growth and prosperity of the city. As the city grew and prospered the value of this land increased, until it became very great. It was then brought into the city and made a part of it, but its value still continued to depend on the growth and prosperity of the city. To arrest the prosperity of the city would be to seriously affect the value of the land; to destroy that prosperity would be to destroy to a great extent that value. The prosperity of the city depends on its streets being kept in repair, and its water and gas and educational facilities being ample. Without these it would fall into decay, and the value of all the real estate in it, including Mr. Kelly's, would be incalculably reduced. The city cannot keep the streets in repair, and furnish an adequate supply of water and gas and educational facilities without money, and the only way it can raise money for those purposes is by taxation. It seems to me, therefore, that the idea that Mr. Kelly is not interested in the objects to which the taxes are to be applied, and that he receives no benefits in return for the taxes, is a mistaken one, even if he received no special benefits from the application of the taxes; and the idea that taxing unproductive property according to its market value is confiscating it, or taking it for public use without compensation, I think is equally a mistaken one.

"Mr. Kelly's case is doubtless a hard one, as is that of his neighbors in like condition, but I think the courts have not power to relieve him; the legislature alone, I think, has the power to do it. In Robinson v. The County of Allegheny, Judge ROGERS says: 'All considerations of hardships and inequality must be left to the legislature. With that we (meaning the courts) have nothing to do.' I think, therefore, that the bill must be dismissed, with costs."

To this report the complainant filed the following among other exceptions.

3. The master finding from the evidence the fact that the city does not extend to this property the considerations which the Supreme Court of Pennsylvania have held to be the essential requisites to justify the exercise of the taxing power for either general or local purposes, the master should have found, as a legal consequence, that complainant's farm was not liable to taxation for municipal purposes, and therefore entitled to relief from the following taxes, as stated in the city's statement of assessments, as set out in the master's report, to wit:

| City Taxes, 4 mills | . | . | . | . | $876.40 |
| City Building, ¼ mill | . | . | . | . | 54.90 |
| Fire, 1 mill | . | . | . | . | 219.60 |
| W. W. Int. & S. F., 1½ mills | . | . | . | 329.40 |
| City School | . | . | . | . | 634.76 |

4. The master finding complainant's farm lands unchanged by and receiving no benefits from consolidation, he should have found that said farm lands were subject to taxation for only such purposes as the same were subject to previous to consolidation, or that similar property is subject to without the city boundaries, and that by the act of consolidation the municipal authorities became and were ex-officio authorized to collect and disburse the same.

These exceptions were overruled, and the bill dismissed by the court in banc, STERRETT, P. J., presiding, and from this decree this appeal was taken.

*A. N.* and *W. H. Sutton*, for appellant.—What benefit, protection or value does the city confer upon these lands? She taxes them for fire, water, schools and city buildings, and yet none of these are necessary or available. The legislature cannot confer upon a municipality the power to tax property that receives no benefit or protection therefrom, and for purposes in which the people taxed have no interest: Sharpless *v.* Mayor of Philadelphia, 9 Harris 147; Hammett *v.* City of Philadelphia, 15 P. F. Smith 153; Washington Avenue, 19 Id. 352; McKeen *v.* County of Northampton, 13 Wright 524; Pittsburgh, Fort Wayne and Chicago Railway Co. *v.* Commonwealth, 16 P. F. Smith 73; Lewis *v.* County of Chester, 10 Id. 329; Borough of Carlisle *v.* Marshall, 12 Casey 402; Hilbish *v.* Catherman, 14 P. F. Smith 159; Durach's Appeal, 12 Id. 491; Grim *v.* Weissenberg School District, 7 Id. 437; Mayor of Newark *v.* State of New Jersey, 13 Am. Law Reg. N. S. 441; Weismer *v.* Village of Douglas, 64 N. Y. 91; Bradshaw *v.* City of Omaha, 1 Neb. 16; State of Georgia *v.* Stanton, 6 Wall. 50. Persons or property cannot be subjected to a local burden for the benefit of others. This principle is as old as Magna Charta, and is embraced in the constitutions of all the United States: Cheaney *v.* Hooser, 9 B. Mon. 342; City of Covington *v.* Southgate, 15 Id. 494; Cypress Pond Co. *v.* Hooper, 2 Metc. 350; Sharp *v.* Dunavan, 17 B. Mon. 223; Maltus *v.* Shields, 2 Metc. 553; Arbegust *v.* City of Louisville, 2 Bush 271; Swift *v.* City of Newport, 7 Id. 37; City of Henderson *v.* Lambert, 8 Id. 609; Morford *v.* Unger, 8 Iowa 85; Langworthy *v.* City of Dubuque, 13 Id. 86; Fulton *v.* City of Davenport, 17 Id. 404; Deeds *v.* Sanborn, Marshall, 26 Id. 419; Buell *v.* Ball, Marshall, 20 Id. 282; O'Hare *v.* City of Dubuque, 22 Id. 144; Davis *v.* City of Dubuque, 20 Id. 458; Deiman *v.* City of Fort Madison, 30 Id. 542; Durant *v.* Kauffman, 34 Id. 194; Mitchell *v.* Kauffman, 34 Id. 194. The mere extension of corporate territorial boundaries does not carry with it *per se* the right and power to tax for all municipal purposes: Seely *v.* City of Pittsburgh, 1 Norris 360; Hammett *v.* Philadelphia, 15 P. F. Smith 146; Washington Avenue, 19 Id. 352; Cooley on Taxation 104

[Kelly *v.* City of Pittsburgh.]

*et seq. ;* Cheaney *v.* Hooser, *supra ;* City of Covington *v.* Southgate, *supra ;* Morford *v.* Unger, *supra.*

The legislature might extend the limits of Pittsburgh to any extent and yet it cannot be asserted that within the included limits she would have the power to tax for *all* municipal purposes, particularly in those in which those taxed could have no possible interest, and from which they could derive no possible benefit. Such taxation is the taking of private property for public use.

*Thomas S. Bigelow,* City Solicitor, and *George Shiras, Jr.,* for the city.—In the case of Smith *v.* McCarthy, 6 P. F. Smith 359, it was held that the Act of April 6th 1867, Pamph. L. 846, extending the limits of the city of Pittsburgh so as to embrace the plaintiff's property, was constitutional, and that it was a question of expediency of which the legislature are the competent and exclusive judges. See also City of Philadelphia *v.* Fox, 14 P. F. Smith 169. In The City of Pittsburgh *v.* Kitty Roup, 1 W. N. C. 254, the power to classify the various kinds of property within the city limits for the purpose of taxation was declared to be legislative and sovereign in its character, and not subject to supervision by the judiciary.

Whenever the corporate boundaries are established it is to be understood that whatever property is included within those limits has been thus included by the legislature because it justly belongs there, as being within the circuit which is benefited by the local government and which ought consequently to contribute to its burdens. After the legislature has, by including the property within the corporation, declared its opinion that such property should contribute to the local government, can the courts inquire into that question and restrain the city functionaries from assessing and collecting taxes for general municipal purposes ?

Where the legislature in the exercise of its constitutional power extends the taxable limits of a city, a court of equity will not interfere by injunction to restrain the collection of taxes within the limits thus extended, to defray the expenses of the corporation, because such property is used for farming and pasturing purposes : Groff *v.* Frederick City, 44 Md. 67. That individual instances of hardship or inequality in the imposition of municipal taxes exist, is a fact universally known, and the abolition of such is one of the problems which the wisdom of man has so far failed to solve. The existence of injustice or inequality in the enforcement of a municipal tax law has been declared and reiterated again and again by this court as insufficient as a ground upon which to pronounce such tax unconstitutional : Weber *v.* Reinhard, 23 P. F. Smith 370.

Mr. Justice GORDON delivered the opinion of the court, January 7th 1878.

[Kelly *v.* City of Pittsburgh.]

The lands of James Kelly, the appellant, upon which the taxes complained of were assessed, were formerly within the township of Collins, and were afterwards, under the provisions of the Act of April 6th 1867 (Pamph. L. 846), made part of the city of Pittsburgh. That there may be no doubt concerning the subject-matter of the plaintiff's complaint, and that we may exhibit precisely the nature and character of his contention, we give the 6th paragraph of his bill *in extenso*.

" It is competent for the legislature, with or without the consent of the citizens, to enlarge the limits of any town or city, and it is competent for the defendant (city), when the requirements of population, commercial and mechanical interests, sanitary or protective municipal purposes require it, to apply to city uses, the full extent of her territorial limits, but your orator expressly denies that such necessity or even propriety exists; on the contrary, large amounts of city territory, on either side and in front of your orator's farm, are occupied, held and owned, without prospects of demand for city purposes for many years to come. Your orator insists that by extension of city territorial limits, the character, situation and use of his said lands were not changed, but remain an improved and occupied farm as before, and agricultural lands only, having received no benefit whatever in the way of municipal improvements, aid, protection, convenience or care; and that, therefore, they are not in any sense liable to municipal or city taxation for any purpose whatever, for no single benefit has been received." Again, paragraph 18, latter part: " But your orator expressly denies that the defendant had any municipal jurisdiction over his said land, or farm, or any right to impose taxes thereon, for city or municipal purposes whatever."

We are thus presented with the broad question of the right of the city to tax rural lands within its bounds for any municipal purpose whatever. It is not admitted that the city succeeded to the rights of the township in this respect, for this would be a surrender of the whole controversy, since it is not doubtful that the township had the power to tax these lands for every lawful municipal purpose whatever.

The power of the legislature to transfer the plaintiff's farm from the one municipality to the other is admitted; indeed that power could not, in the face of Smith *v.* McCarthy, 6 P. F. Smith 359, be gainsaid. But it is urged, nevertheless, that the city's power of taxation must be suspended until this land becomes necessary for city uses. Exactly what this means we are not informed, nor do we suppose it can be certainly known except from some judicial decree not yet rendered. No doubt the meaning of the plaintiff is, that this power of the city is to be suspended or to rest in abeyance until the city is so nearly built up to his lands that they may be advantageously laid out and sold as city lots, and until this

[Kelly v. City of Pittsburgh.]

occurs they are to be exempt from all taxes of a municipa cnaracter. This proposition is novel in Pennsylvania, since we have uniformly, and heretofore without serious complaint, in boroughs as well as cities, taxed rural and even unseated lands for borough and city purposes. This doctrine is, however, supported by certain cases, cited by the learned counsel for the appellant, decided in the superior courts of Iowa and Kentucky. The bill seems closely to have followed these cases, and it is principally upon their authority that the plaintiff's case is rested. These decisions, whilst entitled to great respect, are not to be allowed to unsettle our own rules on the subject of taxation or change the current of our policy on that subject. They are, indeed, of doubtful authority; for Judge Cooley, in his work on taxation, when speaking of these very cases, remarks: that it is difficult to harmonize them with the conceded principles governing the laws of taxation; for they, not questioning the legislation as being in excess of authority, leave it to stand, and only interfere to qualify its effect on the ground that it has been adopted on improper grounds and will operate unequally. This is done on an inquiry into the facts and a substitution of the judicial for the legislative conclusion on a subject not at all judicial; a subject too—the proper limits of city extension—upon which persons are certain to differ widely, and where inquiry, after the judicial method by examination of witnesses, is usually much less satisfactory than that personal knowledge and investigation which legislators are supposed to possess or make. It has, indeed, the effect to suspend the legislation until certain conditions influencing the judicial mind are fulfilled. We need not stop to consider the inconvenience or uncertainty of such a condition of things, or how little consonant it would be with our settled modes of thought and action on subjects of this kind. There is, however, an element in the case in hand, which either did not exist in the cases alluded to or was not sufficiently considered; that is, the subjugation of the lands to previous municipal taxes. The argument in favor of their exemption, would have more strength had they previously to their attachment to the city, been subject only to state and county rates and levies; had they not been within the dominion of any municipality equivalent to that now complained of. But the plaintiff's property was subject to municipal taxes when it was yet in the township of Collins, hence, it is not subjected to any new or even greater powers than formerly; it has been but transferred from township to city. This element breaks the force of the plaintiff's argument, as it leaves him nothing of which to complain; for his complaint is not that his municipal burthens are greater in the city than they were in the township, but that as his lands are now situated the city has no power to tax them in any manner whatever. This is the bald proposition submitted for our discussion; a proposition requiring little consideration for its disposition, since there

4 Norris—12

[Kelly *v*. City of Pittsburgh.]

is here no room for the intervention of judicial interference, or for the exercise of judicial discretion. The legislature certainly did not exceed its powers in the act consolidating the two municipalities, and as both had the power of taxation over their several territories, that power must remain with the present corporation, and the plaintiff's lands must continue liable for those rates and levies to which it was subject under the township government, otherwise they are exempt from those impositions for the maintenance of the public schools, the support of the poor and construction and repair of the highways, from which no one's property ought to be exempt.

On the broad ground, therefore, on which the plaintiff has put his plaint, it cannot be maintained and must be dismissed. Considering it, however, from the less general and most favorable point of view and it but comes to this: that the taxation is unequal and burthensome, and that the complainant is taxed for some things, as police and water, from which, however necessary for the welfare of the municipality, he derives no benefit. Granted, that the tax is both unjust and unequal, it does not follow that the remedy is within the power of the courts; on the other hand, the contrary has been expressly ruled. In the case of Weber *v*. Reinhard, 23 P. F. Smith 370, Mr. Justice SHARSWOOD says, in commenting on the case of the Philadelphia Association *v*. Wood, 3 Wright 73, " the idea that the court could pronounce a tax unconstitutional on the mere ground of injustice or inequality, was expressly repudiated." He further remarks; " There is no provision in the constitution that taxation shall be equal. Sound policy requires that it should be so as far as possible, but perfect equality is not possible."

So in Kirby *v*. Shaw, 7 Harris 258, GIBSON, C. J., says, " As regards taxation, there is no limitation of it. Equality of contribution is not enjoined in the Bill of Rights, and, probably, because it was known to be impracticable." That the person taxed derives no immediate personal benefit from the purposes to which the taxes are appropriated, is, in like manner, no argument against the constitutionality of the law imposing them. For if direct personal benefit were to form a criterion for taxation we should have half the community clamoring at our doors for relief. What interest, direct and personal, has the unseated landowner in the schools or poor of the borough or township in which his lands lie? Or, for that matter, what interest has any one, not having children to educate, in the schools of either township, borough or city? Why shall one pay road tax when roads are of no benefit to himself or his property? Why shall he help pay the expenses of a fire department when his property is so situated that it may burn down before an engine can reach it? Or, why, either in the country or city, having a supply of water on his own premises, shall he pay a water tax? To these questions there is but one answer; these things are intended for the public good, and hence, every one is indirectly

[Kelly *v.* City of Pittsburgh.]

if not directly, benefited thereby; the taxes, levied for their maintenance, are a public burthen and therefore every one must contribute to its support. If, however, this burthen rests unfairly heavy upon some classes or upon some individuals the remedy is not with the courts but with the legislature. As is said in Kirby *v.* Shaw, the judiciary could interfere, only, "by overstepping the limits of its sphere; by arrogating to itself a power beyond its province; by producing intestine discord, and by setting an example which other organs of the government might not be slow to follow." But the legislature has granted all the relief that the plaintiff and his class ought, in reason, to expect or ask, for at the time of filing of this bill, rural lands were authorized to be taxed at but two-thirds of the ordinary municipal rates, and now, by the Act of May 5th 1875, Pamph. L. 124, at but one-half those rates. Thus the injustice and inequality of the taxation complained of, has been, if not wholly obviated, at least, very much mitigated.

Again, taxation is peculiarly a legislative function, and, before we undertake to revise it, we should have a clear warrant therefor in the letter of the constitution. "A tax law must be considered valid, unless it be for a purpose in which the community taxed has no palpable interest—when it is apparent that the burthen is imposed for the benefit of others, and when it would be so pronounced at first blush:" Sharpless *v.* The Mayor of Philadelphia, 9 Harris 147 (BLACK, C. J.); Speer *v.* Blairsville, 14 Wright 150 (AGNEW, J.) But in the present case there is no doubt that the community, called the city of Pittsburgh, of which the plaintiff is a member, has a direct and vital interest in the taxation complained of, and such being the case, there is an end of our power to grant relief.

It will not do for us to stop to consider the peculiar interests of the individual as segregated from the community, for if we should so do, few tax laws could be enforced, since it often if not generally happens that such laws bear hardly upon some individuals, and not unfrequently individual interest is opposed to that of the public. We must have regard to the public welfare. If it be not shown to us that the legislation is for the promotion of 'the good of some other party or community than the one taxed, we have no right to pronounce it unconstitutional. The individual must be regarded as interested in the public welfare, hence his interest must be looked for in that of the community of which he forms part. Now, it may be true that the plaintiff is not personally benefited by either the educational or poor department of the city; but neither is any one not having children to educate, and not being himself a pauper. Yet, for such reason we are hardly prepared to stay the hand of the collector of school and poor rates. He may not be personally benefited by the fire or police department; but the general municipality is largely benefited thereby, and his welfare is found in the prosperity of that municipality. As was well said by the learned

[Kelly *v.* City of Pittsburgh.]

master to whom this case was referred, the value of the plaintiff's property has, heretofore, depended upon the growth and prosperity of the city; but these, in turn, depend upon the character of the city streets and police department, and upon its water, gas, and educational facilities. Without these it would fall into decay, and the value of real estate within the boundaries of the municipality, including that of the complainant, would be incalculably reduced. It is thus apparent that the plaintiff has not only a general, but a direct interest in the objects which the taxation complained of is intended to promote.

Decree affirmed.

AGNEW, C. J., and STERRETT, J., dissent, AGNEW, C. J., filing the following opinion.

The leading facts of this case, raising an important question upon the power of taxation for city purposes, alleged in the bill, and either not denied in the answer or found by the master, are these: The limits of the city of Pittsburgh were extended to embrace a large tract of country composed of farm lands, including the rural townships of Pitt, Oakland, Collins, Liberty and Peakes. The plaintiff owns a farm of eighty acres, bounded by farms, excepting an adjacent parcel of about twenty acres laid off into lots. On the north of his tract lie about one thousand acres in farms, and surrounding and between it and the city lie other farms. His tract is used for farming and dairy purposes only. It was not brought into the city with his consent, and has not been laid off into lots. It lies distant from gas-pipes and lamps, water-pipes, sewers, police beats, and fire apparatus. It has no streets or lanes maintained for city uses, excepting those prior existing roads which were and are sufficient for the use of his farm. It has springs of water sufficient for its use. In consequence of being brought within the city limits it is taxed a sum of $2117, on a valuation of $244,000 for city purposes alone, exclusive of county, poor, and ward school taxes, while the productive yearly value as a farm is $10 per acre, or $800 for the whole.

The master has discussed a number of immaterial questions; for example, the system of valuation and its conclusiveness, the power of the city to extend works into the tract, and the ability of Kelly to lay off his land into city lots. These, however, concern the future chiefly, and are aside from the true question, that of power, to wit: the authority of the city to burthen such property in its existing condition, with taxes for merely city purposes. The rightful power of the city to do this is rested primarily on the power of the legislature to extend the city limits over farm lands. The power to extend is conceded. It is often necessary as a wise preparation to bring such lands into a state necessary to adapt them to future progress. But this concession to the power of extension, and general municipal jurisdiction, gives no power to tax farms hav-

[Kelly *v.* City of Pittsburgh.]

ing no need of city improvements for exclusively city purposes. The powers are essentially different. It might as well be argued that the extension, by Act of Assembly, of the limits of Pittsburgh to the boundaries of Allegheny county, or to that part lying between the rivers Monongahela and Allegheny, would confer a power upon the city to tax all the farms in the county or that section of it between the rivers, for gas, water, police, fire and other city uses. The difference is not in principle, but only in extent of surfaces. It is just as illegal to tax these farms in the several townships heretofore named, as to tax all the townships in that section between the rivers. The latter only exhibits the abuse more palpably. The owners of these farm lands in the townships brought within the limits, have no common interest or benefit of the improvements in the built up, or true city.

If the legislature can, by a mere extension of boundary, authorize the city to tax farm lands for purely city purposes, it might, without extension, direct all farms, within given lines, outside of the city, to pay these city taxes. Thus, when we get rid of that confusion of thought which confounds extension of boundary and power of taxation, we perceive that taxes laid on mere farm lands to pay city levies applicable only to the built-up or true city, is nothing more than an order to farmers to pay for the benefit of the city residents; it is taking the money of A. to pay for improvements made for the use of B. This is palpably and flagrantly unjust, and therefore against common right. If the legislature itself cannot compel farmers to pay city taxes for purely local purposes in which they have no share, it is clear it cannot authorize the city to do indirectly what it cannot do directly. An order, with or without the extension of boundary, upon a certain class to pay taxes for local benefits conferred on others, is wholly different from a power to lay a general tax for the support of government. The latter is a power to which every citizen of a state submits himself in consideration of the general benefits derived from government. But as to the former, it is well said, in Bradshaw *v.* The City of Omaha, 1 Nebraska 16, that the object is to make the owners of farms divide the expense of supporting the municipal government with those who need it; that the true city is the built-up part; while the levy of taxes on farms is to confiscate property outside for the benefit of those within the true city. See, also, Taylor *v.* Porter, 4 Hill 140; Holden *v.* James, 11 Mass. 396.

The power of the legislature is clear to divide the state, for convenient local government, into counties, townships, cities, boroughs, &c., conferring on each an appropriate autonomy. But in doing this, the powers conferred must be adapted to the ends to be accomplished by each. A sound and large discretion is necessarily exercised in this adaptation of powers. But it is equally clear that the powers conferred must have a reasonable appropriatenesss to the

end proposed.   Such an exercise of power only can fairly comport with the true and acknowledged principles of our American governments, which are all founded on the rights of the people, and for their "peace, safety and happiness:" sect. 2, Declaration of Rights, New Constitution.   These principles are well stated by Justice Chase, in Calder *v.* Bull, 3 Dallas 386: " The people of the United States," he says, " erected their constitutions or forms of government to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect their persons and *property* from violence.   The purposes for which men enter into society will determine the nature and terms of the social compact; and as *they* are the foundation of the *legislative* power, *they* will decide what are the *proper* objects of it.   The *nature* and *ends* of legislative power will limit the *exercise* of it."   Again : " There are acts which the federal or state legislatures cannot do without exceeding their authority.   There are certain *vital* principles in our free republican governments which will determine and overrule an *apparent* and *flagrant* abuse of the *legislative* power; as, to authorize manifest injustice by positive law ; or, to take away that security for *personal liberty* or *private property* for the protection whereof the government was established."

The same thoughts were thrown out by Chief Justice Marshall, in Fletcher *v.* Peck, 6 Cranch 87 : " It may well be doubted," he says, " whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation ?   To the legislature all legislative power is granted; but the question whether the act of transferring the property of an individual to the public be in the nature of the legislative power, is well worthy of serious reflection."

· This is precisely the question before us, whether, under the mere name or color of taxation, the legislature can confer on a city a power to transfer the money or property of farmers outside of the true city, to those who live within it, for purposes by which they alone are benefited ?

The inviolability of the right of private property and the natural boundary of the legislative power has been enforced already in this state in the case of Washington Avenue, 19 P. F. Smith 363, in these words : " When, therefore, the constitution declares in the ninth article, that among the *inherent* and indefeasible rights of men is that of acquiring, possessing and protecting property, that the people shall be secure in their *possessions* from unreasonable searches and *seizures*; that no one can be *deprived* of *property* unless by the judgment of his peers or the law of the land; that no man's *property* shall be taken or *applied* to public use without *just compensation* being made ; that every man for an injury to

[Kelly v. City of Pittsburgh.]

his *lands* or *goods* shall have remedy by due course of law, and right and justice administered without sale, *denial* or delay, and that no law *impairing* contracts shall be made, and when the people to guard against *transgressions* of the high powers delegated by them have declared that all these rights are excepted out of the general powers of government, and shall for ever remain inviolate, they for their own safety stamped upon the right of private property an inviolability which cannot be frittered away by verbal criticism on each separate clause, nor the united fagot broken stick by stick, until all its strength is gone.    There is a clear implication from the primary declaration of the inherent and indefeasible right of property, followed by the clauses guarding it against specific transgressions that covers it with an ægis of protection against all unjust, unreasonable and palpably unequal exactions, under any name or pretext; nor is this sanctity incompatible with the taxing power, or that of eminent domain, where for the good of the whole people burdens may be imposed or property taken.    I admit that the power to tax is unbounded by any express limit in the constitution; that it may be exercised to the full extent of the public exigency.    I concede that it differs from the power of eminent domain, and has no thought of compensation by way of return for that which it takes and applies to the public good, further than all derive benefit from the purpose to which it is applied.    But nevertheless taxation *is* bounded in its exercise by its own nature, essential characteristics and purpose.    It must, therefore, visit all alike in a reasonably practicable way, of which the legislature may judge, but within the just limits of what is taxation.    Like the rain it may fall upon the people by districts and by turns, but still it must be public in its purpose and reasonably just and equal in its distribution, and cannot sacrifice individual right by a palpably unjust exaction, to do so is confiscation, not taxation; extortion, not assessment; and falls within the clearly implied restrictions of the Bill of Rights."

Therefore, while we concede the wide range to be given to legislative discretion in adapting the means to the end, that is, to the purposes of *local* government, there is a limit beyond which the legislative power cannot sacrifice the sacred right of private property.    This limit is reached when it palpably and plainly sacrifices this right, which the people themselves have jealously guarded against transgression in their fundamental law.    There must be, therefore, a reasonable appropriateness in the means employed to execute the legislative purpose.    This has been well expressed by Chief Justice Marshall, that bright luminary of constitutional law, in discussing the power of Congress, under the 19th clause of the 8th section of the 1st article of the Federal Constitution, to make all laws necessary and proper for carrying into execution the federal powers. " But we think (he said) the sound construction of the constitution must allow to the national legislature that discretion with regard to

the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner *most beneficial* to the people. Let the end be legitimate, let it be within the *scope of the constitution*, and all *means* which are *appropriate*, which *plainly are adapted to that end*, which are *not prohibited*, but *consist* with the *letter* and *spirit* of the constitution; are constitutional:" McCulloch *v.* Maryland, 4 Wheaton 316. The italics are mine.

This was said by that great jurist of an express power to pass all laws necessary and proper to execute expressly conferred powers—the means must be appropriate—must be plainly adapted to a legitimate end—one not prohibited, but consistent with the letter and *spirit* of the constitution. How much stronger then does the language apply to a case like this, where no express power over the means is given, but the power is left to be inferred only from its appropriateness.

The taxing power conferred on the city, therefore, cannot extend· to such a case as this, where a ruinous burthen is laid on·land wholly rural and outside of the city proper, for purely local and city objects, in which Mr. Kelly the owner has no interest. This distinction between *local* taxation for purely *local* purposes, and general taxation by the state, in which all are interested, cannot be overlooked or thrust aside. It is the very pivot of the question : People *v.* Mayor of Brooklyn, 4 Comst. 419 ; Morse *v.* Stocker, 1 Allen 159. It is not the extension of boundary which is unconstitutional, but it is the imposition of a burthen, where it is palpably and flagrantly unjust and contrary to common right : Bradshaw *v.* Omaha, 1 Neb. 16.

We are not without very respectable and numerous precedents for the doctrines contended for. The very point in question is decided in the following cases : Cheaney *v.* Hooser, 9 B. Mon. 330 ; ·Covington *v.* Southgate, 15 Id. 491 ; Morford *v.* Unger, 8 Iowa 82 ; Langworthy *v.* Dubuque, 13 Id. 86 ; Fulton *v.* Davenport, 17 Id. 404 ; Bradshaw *v.* Omaha, 1 Neb. 16. The opinions in some of these cases are elaborate, well-considered, and very convincing to my mind.

Much of the answer given to this view of the natural right of property secured by constitutional limitations, is a mere criticism on words. Thus it is said the protection claimed refers only to the power of *eminent domain*, which relates to a taking, not a taxation of property. Even this clause is entitled to a liberal interpretation : Pearce's Heirs *v.* Patton, 7 B. Mon. 162. But the Declaration of Rights does not confine its protection to this clause, when it declares the *inherent* right of private property, and places it on the same high plane of protection as the rights of *life and liberty*, or when it declares that the *possessions* of the people, as well as their persons, houses and papers, shall be secure from *unreasonable seizures ;*

and when it asserts that free governments are instituted for their peace, safety and happiness.   Indeed, the whole circle of fundamental rights rise up in earnest protest against the doctrine of the absolute despotism of the legislative power over property; while the clause relating to the power of eminent domain only strengthens the protest.   It is not the province of the courts, which stand between the citizen and the abuse of power by public servants, to fritter away these clauses to mean next to nothing.   Eminent domain is simply high and eminent dominion, and is but another name for sovereignty.   Specially, it is but one of the powers of sovereignty, which includes the taxing power as well as that which takes.   Taxation exacts of the owner of property a share of the public burdens, as his just proportion, for the benefits received from the government.   Eminent domain goes a step farther, and takes more than a just share, and therefore awards compensation for the excess: People v. Brooklyn, 4 Coms. 420.   But it is evident that both are founded on the consideration of benefits conferred in some form. Sovereignty, in a constitutional government under a bill of rights, imports no arbitrary power for *any* purpose.   What is taxation but a delegated power, and therefore subject to the fundamental rights of men, which government is intended to protect, when the exercise of this power conflicts with them without just cause ?   If the power to tax be absolute and unbounded by just cause, there is no protection whatever.   You cannot take property without just compensation; but you may tax it to destruction.   You may not lop off a limb or cut off the head without a just cause, but you may bleed the whole trunk to death.   Or if you cannot find a good cause, you may presume it; or you may find it in some infinitesimal quantity to furnish a pretext.   Clearly, the power of taxation is not so destructive.   It is bounded by the exigency which calls forth its exercise.   Kirby v. Shaw, 7 Harris 259, a case admittedly on the verge of the taxing power, contains probably the strongest expressions of the absolute character of the taxing power; yet these must be taken in reference to the case itself which called them forth, and it was one where a *special benefit* was conferred on the borough of Towanda, and the chief justice made this the corner stone of his argument.

In discussing this question, the advocates of unlimited power ignore the distinction so palpable between the general power of taxation for the benefit of the whole state, though laid in districts, and the imposition of local burthens in return for *specific benefits*.   As to the former, all men participate more or less in the general advantages of government; but there can be no such postulate for the latter, where it is palpably clear the local burthen is imposed without just cause and is plainly for the benefit of others.   And a court must regard a substantial return not a merely speculative or shadowy benefit, which amounts to no more than a pretext.

When, therefore, the exercise of the power of local taxation is manifestly arbitrary and palpably unjust and without just cause, when, according to Chief Justice Marshall, it is not "appropriate" to the true purpose of local or city government, it is not constitutional, it infringes the fundamental rights of the citizen and is void. This is the rule laid down in Sharpless *v.* City of Philadelphia, 9 Harris 164, and many other cases to determine the constitutionality of laws: Fletcher *v.* Peck, 6 Cranch 87; Cooper *v.* Talfain, 4 Dallas 14; Eakin *v.* Raub, 12 S. & R. 339; Commonwealth *v.* Smith, 4 Binn. 123; Cheaney *v.* Hooser, 9 B. Mon. 330; Morford *v.* Unger, 8 Iowa 82; Bradshew *v.* Omaha, 1 Neb. 16. In this case it is palpably, clearly plain, that as to gas, water, fire and police, Kelly's farm is taxed for purely city purposes in which it has no share. It is perfectly manifest that his money is transferred to a local use for the benefit of others. Why then shall a court hesitate to pronounce the burthen contrary to right, and void. No stronger authority will be found for the principle I have insisted upon than the decision of the whole court in the case of the Bridge over Sawmill Run, *ante* 163. The very foundation of the opinion of Justice WOODWARD is the absence of peculiar benefit to the party assessed. On the doctrine of general benefits, or a supposed or infinitesimal benefit the assessment was valid. Its rejection proves that this court does look at the nature and practical operation of the charge, and the want of any substantial return for the tax, in local taxation.

Reference is made to the Kitty Roup case as covering this. That is a mistake. It decides one point only, the power under the new constitution to *classify* the subjects of taxation. But the power to classify is essentially different from the power to impose *any* tax. Classification implies that the subject is taxable for a proposed purpose. But our question is upon the power to impose *any* tax for gas, water, fire and police. The *classification* into *urban* and *rural*, the only point in the Kitty Roup case that had a majority of the court, does not determine whether the *rural* is subject to a tax for merely city purposes. Some rural properties may be subject, for they may have the benefit of gas, water, police and other city advantages. But when the property is, as here, a farm not subject to the tax for these city purposes, it is manifest that classification has nothing to do with the case. Classification merely reduces the amount of the tax on the subject of the classification (when it is a taxable subject) to two-thirds if rural. But the point made in this case is that the subject is not taxable at all for these purely city uses, and the tax is, therefore *illegal* in whole and in part. It is not taxable for two-thirds or any other proportion. It is not a tax for those general purposes which concern the state, such as county, poor, road and school tax. That would bring the case within the general taxing power. In such a case it is immaterial whether the tax is imposed

[Kelly v. City of Pittsburgh.]

over the state at large, or in districts, for the purposes are those of general advantage.

We have arrived just at that point in the history of local taxation where, in my judgment, this court should stand firmly as the bulwark of human rights to prevent their sacrifice in detail and by gradual encroachment. If the rights of property can be taken or taxed away, without a justifiable cause to bring the legislative act within the just powers of government, it is confiscation, not legal contribution. Planted on the broad foundation of the rights of men, I shall stand alone, if no one go with me, in the defence of constitutional liberty, opposed to every scheme of plunder, however gilded or bright, which the tenants of municipal places may devise.