STATE ex rel. HENDERSON, Relator, *v.* DAWSON COUNTY et al., Respondents.

(No. 6,651.)

(Submitted February 24, 1930. Decided March 15, 1930.)

[286 Pac. 125.]

124

*Messrs. Hildebrand & Warren,* for Relator, submitted a brief; *Mr. Raymond Hildebrand* argued the cause orally.

*Mr. F. S. P. Foss,* for Respondents, submitted a brief.

128

*Mr. L. A. Foot,* Attorney General, and *Mr. C. N. Davidson,* Assistant Attorney General, *Amici Curiae,* submitted a brief in behalf of the State Board of Land Commissioners; *Mr. Davidson* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Thomas Henderson, as a resident taxpaying freeholder of Dawson county, made application for an original writ enjoining the county and its board of county commissioners from issuing and selling certain "county high school bonds." In obedience to an order to show cause why the writ should not issue, respondents demurred to the application, and advised the court that they would refuse to plead further in the event the demurrer was overruled. The merits of the controversy were fully covered by briefs and oral argument, and it is now before us for final determination.

The application discloses the following facts: Dawson County is of the sixth class; it maintains an accredited high school, and owns a high school site and building which is insufficient to accommodate the pupils enrolled. Within the county the Richey district, No. 78, maintains a duly accredited district high school.

In August last, pursuant to the provisions of section 1252, Revised Codes 1921, and Chapter 29, Laws of 1929, a sufficient petition was duly presented to the board of county high school trustees, praying the submission to the people of the question as to whether or not the county should be bonded to finance the following purposes, in the following estimated amounts, to-wit: Prorated to Richey High School (being the percentage of the total bond issue which the assessed valuation of the property of district number seventy-eight bears to the assessed

valuation of the entire county), $11,553.00. To erect and equip a county high school building, $225,000. To purchase a site * * * , $33,477.00.''

Instead of certifying this proposition to the county commissioners, the high school board certified the following question: ''Shall the Board of County Commissioners * * * be authorized to issue and sell bonds to the amount of * * * $265,000.00, * * * the proceeds to be divided so that $10,205.15 be delivered to Ritchey District, as its percentage, and $254,794.85 be used to build and equip an addition to the present Dawson County High School Building.'' This question was duly submitted to the ''qualified electors'' of the county at a special election, which resulted in a substantial majority in favor thereof. By resolution duly passed, the board of county commissioners directed the issuance and sale of the bonds in accordance with the precise question submitted to the electors, the bonds ''to be known as Dawson County High School Bonds,'' and offered a portion thereof for sale. The state board of land commissioners bid on this offer, and its bid was accepted. Unless restrained, the board of county commissioners will sell the first installment of the bonds to the state board, and will thereafter sell the remaining bonds and distribute the proceeds in the manner directed by the vote of the people, and will later levy taxes on all the taxable property of the county for the payment of interest on the bonds and for their ultimate payment.

The applicant owns taxable property within the county but outside of the Richey district. The application shows that the ''bonded indebtedness'' of Dawson county is already $387,000; the assessed valuation of taxable property in the county $22,720,013, and the ''taxable valuation'' thereof $7,163,428.

It is contended that the issuance and sale of the bonds would be illegal for various constitutional and statutory reasons, which will be considered in their logical order.

1. The paramount issue raised is as to the validity of that ▮▮▮ portion of Chapter 29, Laws of 1929, which reads: "It shall * * * be lawful for a majority of the Board of School Trustees of any county high school * * * to certify to the Board of County Commissioners for submission to the electors of the county, the question as to whether or not county bonds shall be issued for the purpose [of erecting and equipping high school buildings], the proceeds thereof to be divided between the county high school and the several four-year accredited district high schools of the county in the manner designated by said Board. In all such cases the question submitted * * * shall definitely state the amount * * * which is to be expended for or upon the county high school, and the amount thereof which is to be divided among * * * district high schools, * * * which allotment shall be prorated * * * [according to the ratio of the assessed valuation of property]." Provision is then made for the levying of taxes to pay the interest on the bonds and finally pay the principal. It is charged that these provisions are violative of the following constitutional provisions:

"All moneys borrowed by or on behalf of the state or any county, city, town, municipality or other subdivision of the state, shall be used only for the purpose specified in the law authorizing the loan" (sec. 3, Art. XIII).

Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax" (sec. 11, Art. XII), and

"The legislative assembly shall not pass local or special laws in any of the following enumerated cases, * * * regulating county or township affairs; * * * providing for the management of common schools; * * * the assessment and collection of taxes, * * * where a general law can be made applicable" (sec. 26, Art. V).

It is further asserted that the enactment "is void and of no effect for the reason that it is ambiguous and inconsistent in

its provisions, incapable of harmonious construction and fails to provide a workable plan," and that the bonds contemplated are not county bonds, and, if so, the Act directs the diversion of a portion of the proceeds therefrom to a noncounty purpose.

For the purpose of determining the questions thus raised, and others later discussed, it is necessary to review past legislation on the subject, as Chapter 29 above is the culmination of many legislative attempts to provide a workable plan for the financing of county high schools in the erection and maintenance of needed buildings.

The policy of this state has always been to provide free and liberal education for the children and youths residing within its borders, from the lowest elementary branches of instruction up to and including a full university course. To this end our Constitution declares that educational institutions shall be established and supported by the state (sec. 1, Art. X, Constitution of Montana), and imposes upon the legislature a positive duty to "establish and maintain a general, uniform and thorough system of public free, common schools" which "shall be open to all children and youth between the ages of six and twenty-one years" (secs. 1 and 7, Art. XI).

The framers of the Constitution did not have in contemplation the establishment of high schools as a county project and independent of school districts, but declared it the duty of the legislature "to provide by taxation, or otherwise, sufficient means, in connection with the amount received from the general school fund, to maintain a public, free common school in each organized district in the state, for at least three months in each year" (sec. 6, Art. XI), and, having prohibited counties from becoming indebted in excess of a fixed maximum (sec. 5, Art. XIII), declared an independent limitation of indebtedness for school districts (sec. 6, Art. XIII).

However, a high school education is a necessary intermediate step between the ordinary grade schools and the university courses provided for, and the term "common" as applied

to our schools "bears the broadest and most comprehensive signification, it being equivalent to public, universal, open to all." It is used in contradistinction to private and denominational schools, colleges and the like, but has no reference to the grade of school or what may be taught therein, nor the method of rule or government thereof. (*People* v. *Board of Education of City of Brooklyn,* 13 Barb. (N. Y.) 400; *Roach* v. *Board of Directors,* 7 Mo. App. 567; *Special School District* v. *Bangs,* 144 Ark. 34, 221 S. W. 1060; *Board of Education* v. *Board of Commissioners,* 127 Okl. 132, 260 Pac. 22.)

Thus, under constitutional authority, the legislature may either leave the matter of high school education to the several school districts of a county or provide a different method of rule or government for this class of "common schools." For years the first method was followed; such high school education as was afforded was given in district school courses or high schools established in districts, without legislative sanction.

In 1899 the legislature provided for the establishment of free county high schools by a vote of the electors of the county, and for which trustees were to be appointed by the board of county commissioners; these trustees were empowered to "bond the county" for the purpose of building and equipping a county high school building. (Laws 1899, p. 59.) Under this Act it would seem the legislature intended to make such a high school a county institution in all essentials. This Act was, however, amended in 1901 so as to take the appointment of the trustees out of the hands of the county commissioners, and, in effect, to place control of the high school in the hands of the county superintendent of schools (Laws 1901, p. 6), thus making the county a sort of sublimated school district for high school purposes, but still leaving the method of financing the building and equipment of necessary accommodations, as before, by the issuance of "county bonds." Control over these matters was later returned to the board of county commissioners (sec. 921, Rev. Codes 1907), harmonizing the provisions relat-

ing to county high schools and making them more nearly county projects.

Difficulty seems, however, to have been encountered by reason of the fact that districts within counties desiring to establish county high schools, maintained district high schools, and to levy taxes upon the inhabitants of such districts, for county high school purposes, would seem to violate the spirit, at least, of the Constitution. The legislature attempted to meet this situation by the passage of Chapter 167, Laws of 1917, in which it attempted to eliminate districts maintaining a high school from participation in county high school affairs, and in which it was declared that the question of the issuance of county bonds for high school purposes should ''be submitted to the electors only who reside outside of such district or districts maintaining high schools.'' This attempted solution was declared unconstitutional in *Hamilton* v. *Board of County Commissioners*, 54 Mont. 301, 169 Pac. 729, 730, on the ground that ''throughout the School Code wherever county high school bonds are mentioned, they are referred to as county bonds,'' and it was held that ''a county bond is one issued by the county, and to the payment of which the full faith and credit of the entire county are pledged,'' and that therefore the exemption of a part of the property of the county from the operation of the bonds and the payment of taxes for their redemption destroyed the character of the bonds as ''county bonds,'' and violated the uniformity clause of the Constitution. (Sec. 11, Art. XII, above.) It was further declared that the enactment was void, in that it entitled children or youths from the exempted district to attend the county high school, while exempting the property of the district from taxation for county high school purposes.

Chapter 29, Laws of 1929, is clearly an attempt on the part of the legislature to meet and correct the deficiencies in the Laws of 1917, as pointed out in the *Hamilton Case*. In the Act every requirement of the definition of a ''county bond'' is fully met; the bonds provided for are declared to be

"county bonds" for high school purposes, which purposes under the law as it exists to-day are clearly county purposes. The bonds are issued only after an election held on call of the county commissioners, and in which election all of the qualified electors of the county take part; when issued, the full faith and credit of the entire county are pledged for the repayment of the money borrowed, and for that repayment taxes are to be levied and collected upon all of the taxable property in the county.

The further objection to the law of 1917, pointed out in the *Hamilton Case*, that is, that reciprocity between taxation and benefits received did not exist, was met by the legislature in 1929, by providing that all accredited high schools in a county, whether county high schools or district high schools, shall be open to all eligible pupils residing in the county, without the payment of tuition. (Chap. 109, Laws 1929, amending sec. 1282, Rev. Codes 1921.) That body further unified the high schools of counties and districts therein by declaring that, in any county not maintaining a county high school, but in which one or more districts maintain duly accredited high school classes, a tax levy upon all taxable property in the county shall be made for the benefit of such high schools. (Chap. 107, Laws 1929, amending sec. 1281, Rev. Codes 1921.) It was already provided that, in counties in which both county and district high schools were maintained, the district high schools should share in all moneys raised by taxes for high school purposes. (Sec. 1280, Rev. Codes 1921.) Thus the district high schools are now county institutions and a part of the county high school system, just as the several institutions of higher learning distributed over the state are a part of the "University of Montana" (sec. 852, Rev. Codes 1921) and state institutions.

It is said that "under the operation of the law, taxes will be levied and assessed upon all property of the county for the payment of the interest and principal of the bonds to be

issued, but there will be refunded to the taxpayers of the Richey district such proportionate share of the taxes as are collected in such high school district," thus violating the uniformity clause of the Constitution. In this counsel misconceives the purpose of the Act.

There is no provision for a refund of taxes to taxpayers or to the district maintaining a high school. The Act requires the levy of taxes upon all taxable property of the county for the payment of interest and the final repayment of the principal of the bonds issued under it; all of the taxes thus levied, when collected, are to be kept in a separate fund, and therefrom the interest and principal paid. The division of the proceeds of the bonds is made to the county high school and the districts maintaining high schools as an entity, not to taxpayers. The portion of the proceeds thus distributed to a district may, it is true, be used by the trustees for the repayment of outstanding bonds, or in the maintenance of their high school; but, while this distribution may, in a sense, work to the advantage of the taxpayers of the school district over those of the remainder of the county, inequality in the distribution of the proceeds of a tax does not come within the inhibition of the Constitution or invalidate the tax. (See note to *Bayville Village* v. *Boothbay Harbor* (110 Me. 46, 85 Atl. 300), in Ann. Cas. 1914B, 1138.)

Further, the inequality is more seeming than real, as the law makes no provision for the building and equipping of district high school buildings at county expense or by county credit, and, if the district's proportionate share of the proceeds of the bonds is used to pay off outstanding bonds of the district, it merely tends to equalize a burden already borne by the taxpayers of the district which was not shared by the taxpayers of the county generally, though the district high school be, as above shown, a county project in which all the taxpayers of the county are, at least theoretically, interested. And, if used for the maintenance of the district high school,

the taxpayers of the county as a whole benefit thereby, as the law authorizes tax levies upon all of the taxable property in the county for the support of these district high schools.

In *Kelly* v. *Pittsburgh*, 85 Pa. 170, 27 Am. Rep. 633, it is said "that the person taxed derives no immediate personal benefit from the purposes to which the taxes are appropriated is * * * no argument against the constitutionality of the law imposing them. For if direct personal benefit were to form a criterion for taxation we should have half the community clamouring at our doors for relief. What interest, direct and personal, has the unseated land-owner in the schools or poor * * * or, for that matter, what interest has anyone, not having children to educate, in the schools * * * ? Why shall one pay road tax when roads are of no benefit to himself or his property? * * * To these questions there is but one answer; these things are intended for the public good, and hence, everyone is indirectly, if not directly, benefited thereby; the taxes levied for their maintenance are a public burden, and, therefore, everyone must contribute to its support. If, however, this burden rests unfairly heavy upon some classes or upon some individuals, the remedy is not with the courts, but with the legislature."

We see nothing in the Act considered which is violative of any of the constitutional provisions cited. The distribution of the proceeds of the sale of bonds, as provided for, is in accordance with the law authorizing the loan; the law is not violative of the provision against special Acts, and the taxes to be levied will be as just and equal throughout the whole county as may well be; the funds borrowed will be used wholly for a public county purpose. Further, after a careful study of the entire "School Code," we are of the opinion that the legislature has devised a cohesive and workable plan for the financing of such purposes which distributes the necessary burden upon the taxpayers as near equally as possible to be done, considering the objects to be accomplished.

2. It is contended that the bond issue is void, as it raised the total ''bonded indebtedness'' of the county above the ''constitutional and statutory limitations.''

Added to the outstanding bonded indebtedness of Dawson County, as shown by the application here, the amount of these bonds would raise the total indebtedness of the county above 5 per cent of the per centum of the actual cash value of all property of the county on which taxes are to be figured under sections 1999 and 2000 of the Revised Codes of 1921 (Chap. 51, Laws 1919), which is but 31.2 per cent of the actual cash value of all such property, but falls far short of being 5 per cent of such actual cash value.

Section 5, Article XIII, of our Constitution, prohibits any county from becoming indebted ''in any manner, or for any purpose'' in excess of 5 per cent of the value of ''the taxable property therein,'' to be ascertained by the last assessment. As the basis of taxation, at the time the Constitution was adopted, was the full cash value of the taxable property, and the framers of the Constitution had that basis in mind, the constitutional prohibition refers only to exceeding 5 per cent of the full cash value of such property. (*State ex rel. Galles* v. *Board of County Commissioners,* 56 Mont. 387, 185 Pac. 456.) Clearly, this provision for further bonded indebtedness of Dawson County does not violate the ''constitutional limitation'' on the showing made. It will be noted, however, that this showing is only as to bonded indebtedness, while the Constitution prohibits becoming indebted ''in any manner, or for any purpose.'' Dawson County may have a large warrant or other indebtedness which might possibly, taken with the present issue, exceed the constitutional limitation, but, as such other indebtedness would have to exceed $484,000 to bring about this result, it is highly improbable that this is the situation.

Prior to 1923 the ''statutory limitation'' on the ''bonded indebtedness'' of a county was the same as the ''constitutional limitation,'' inasmuch as the wording of the statute followed

that of the Constitution as to the basis of computation (sec. 4614, Rev. Codes 1921); the wording was then changed to not to exceed "five per centum of the per centum of the assessed value of the property upon which taxes are levied and paid." (Chap. 21, Laws of 1923.) Under this amendment, the statutory limitation is computed on the sum total of the figures on which the county clerk computes taxes. Thus the legislature greatly reduced the maximum of indebtedness below the constitutional limitation, and its action in so doing has been upheld. (*Heckman* v. *Custer County*, 70 Mont. 84, 223 Pac. 916.)

Section 4614, above as amended, was twice amended in 1925 (Chaps. 84 and 99, Laws of 1925) without change in the above regard, although the wording is altered in Chapter 99 to eliminate the repetition of the term "per centum."

We have now two distinct prohibitions: That of the Constitution prohibiting a county from becoming indebted "in any manner, or for any purpose," in excess of 5 per cent of the full cash value of all its taxable property, and that declared by statute which refers only to bonded indebtedness and is determined from the percentage of the full cash value, on which taxes are computed; each applies generally to all proposed bond issues for county purposes. However, the legislature, being limited only in its power by the Constitution, may extend, as well as restrict, the maximum limit within the limits fixed by the Constitution. The amendment to section 4614 indicates a deliberate intention on the part of the legislature to change the policy of the state in so far as it deals with the bonded indebtedness for general county purposes. But, as demonstrated above, the creation and maintenance of high schools are not, strictly speaking, county purposes, and the law in this regard is rather a lending of the credit of the county for this purpose. From the beginning, school districts have been permitted to incur indebtedness up to 3 per cent of the value of the taxable property in the district, regardless of the indebtedness of the county (sec. 6,

Art. XIII, Const.), thus authorizing a burden on the taxpayer to this extent in excess of the constitutional limit of the indebtedness of his county.

Having chosen to require counties to lend their credit to their high schools rather than to make provision for county high school districts and thus render the constitutional limitation as to school districts applicable, the legislature declared that the issuance of bonds for high school purposes ''shall not increase the indebtedness of any county beyond the maximum limit fixed by the state Constitution'' (Sess. Laws of 1899, p. 59 and 1901, p. 6, above), and this provision is carried forward as a part of section 1276, Revised Codes of 1921, and was the law at the time section 4614 was amended. In neither 1923 (Chap. 21) nor 1925 (Chaps. 84, 99), when amending section 4614, did the legislature see fit to change this provision with regard to county high school bonds. In 1929 (Chap. 29) the legislature amended section 1276 above, and therein reiterated its declaration that county bonds might be issued for this purpose, provided such issue ''shall not increase the indebtedness of any county beyond the maximum limit fixed by the state Constitution.'' It must be presumed that, at the time this declaration was made, the legislature was fully cognizant of the ''statutory limitation'' on county bonded indebtedness, and deliberately intended to provide that the constitutional, rather than the statutory, limitation should apply.

The legislative action is explainable on the theory that it considered county high schools as more in the nature of district than county projects, and had in mind that many counties might be required to furnish high school facilities and education although they had already reached their statutory limitation of bonded indebtedness, and that, under the liberal educational policy of the state, they should be permitted to do so in much the same manner as are school districts under the Constitution. However this may be, in so far as the subject under consideration is concerned, the Act of 1929 supersedes section 4614 as amended, and, where a section or a part

of a section is amended, it is not to be considered as having been repealed and re-enacted in its amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted. (*Edwards* v. *Lewis and Clark County,* 53 Mont. 359, 165 Pac. 297.) If we were to consider the amendment to section 4614 as impliedly amending section 1276, we have the declaration of the legislature in 1929 that such was not the intention of that body, but that the constitutional limitation has applied to school bonds of this nature since 1899. On the showing made, the issuance of these bonds in the instant case is not invalid as an unlawful increase of the county's indebtedness.

3. It is however, urged that the action of the county commissioners was void, for the reason that the question of the issuance of the bonds was submitted to the "electors" of the county instead of to the "taxpayers," as required by Chapter 29, Laws of 1929.

The only reference to "taxpayers" in the Act of 1929 is found in the paragraph preceding that above quoted, which reads: "The Secretary of the Board of County High School Trustees, whenever a majority of the Board shall so decide, and upon the presentation of a petition in the manner provided by law, shall certify to the Board of County Commissioners that they have decided to submit to the taxpayers of the county the question whether the county bonds shall be issued for the purpose of" erecting and equipping buildings. This paragraph makes no mention of district high schools, and is applicable in counties in which no such high schools are maintained, the succeeding paragraph being added to provide the method of procedure when district high schools are maintained in the county.

The use of the term "taxpayers" may have crept into the first paragraph of Chapter 29, Laws of 1929, as originally enacted in 1921 (Chap. 132, Laws of 1921, which became section 1276, Rev. Codes 1921), by reason of the fact that, as a part of the Act of 1921, the petition on which the board

must act must be signed by at least 20 per cent of the "tax-payers" of the county, whose names appear on the assessment-roll for the next preceding year (sec. 1252, Rev. Codes 1921).

Nowhere, in either the first or second paragraph of Chapter 29, above, is there any requirement that the question, when certified, shall be submitted to the "taxpayers"; on the contrary, the requirement is that the question be submitted to the "electors," and this term is used three times in the Act.

Our Constitution (sec. 2, Art. IX) provides that "every person of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all general elections * * * and upon all questions which may be submitted to the vote of the people. * * * Taxpaying is not one of the constitutional qualifications, and, in the absence of any property test, a person who possesses the constitutional qualifications is entitled to vote on a submitted question without reference to his property holdings. (*State ex rel. Eagye* v. *Bawden,* 51 Mont. 357, 152 Pac. 761.)

At the time Chapter 132, Laws of 1921, was enacted, our Codes merely declared the constitutional qualifications of voters with the additional requirement, as a condition precedent, of registration. (Sec. 540, Rev. Codes 1921.) In 1923 the legislature attempted to restrict the right to vote on any proposal to create or increase any indebtedness of the "state, county, city, town * * * or other municipal corporation" to registered electors "whose names appear on the last preceding assessment-roll." (Chap. 98, Laws of 1923.) The question as to the legislative power to add additional qualifications to those declared by the Constitution, discussed in *State ex rel. Chenoweth* v. *Acton,* 31 Mont. 37, 77 Pac. 299, *State ex rel. Lang* v. *Furnish,* 48 Mont. 28, 134 Pac. 297, *State ex rel. Fadness* v. *Eie,* 53 Mont. 138, 162 Pac. 164, need not now be considered, as, prior to the proceedings before us, the legislature amended the Act of 1923 by striking out the words "state" and "county," thus leaving the restriction to apply

only to proposals respecting the finances of cities, towns and other like municipal corporations less than the state and county. The proposal submitted in the instant case was, of necessity, one to be submitted to the electorate of the county. (*Hamilton* v. *Board of County Commissioners*, above.)

The mere fact that the law requires a petition by "taxpayers," for which there is reason, and that, in the one instance, the board of trustees is empowered to certify its decision that the question be submitted to the "taxpayers," cannot overcome the plain requirement that the board of county commissioners submit the question to the "electors," and, as such submission is permissible under the Constitution and statutes, the submission here was proper.

4. Is there a fatal variance between the proposal called for by the petition and the question submitted?

Section 1252 above, read in connection with Chapter 29, Laws of 1929, authorizes the submission of a bond issue for high school purposes, only on petition. The presentation of a proper petition is a condition precedent to action. (44 C. J. 133.)

The purpose of all parties concerned was to provide adequate high school accommodations for the pupils of the county. With this purpose in mind, the petitioners requested the submission of the question as to whether or not the sum of $300,000 should be borrowed in order to purchase a site and erect a new schoolhouse, disregarding the fact that the county already owned a site and building. On consideration of the petition, the high school board evidently determined that the site was adequate and the purposes of the high school could better be served by the erection of an addition to the existing building. The reduction on the amount of bonds to be issued is covered practically by the elimination of the cost of a site and the reduced percentage to be paid to Richey district, and the variance affects only the application of the proceeds of the bonds, in the building of an addition to an existing building instead of the

erection of a separate building; this change in application was ratified by the electors. It was a change in the interest of economy, and was not a radical departure from the purpose of the petitioners. At most, the change made was an irregularity which, since the election has been held, without objection, is not sufficient to invalidate the proceedings. (*Connolly* v. *Beason*, 100 S. C. 74, 84 S. E. 297; *Ward* v. *Board of Commissioners of Okfuskee County*, 114 Okl. 246, 246 Pac. 376; *Thomas* v. *Lee County*, 98 Miss. 232, 53 South. 585; *Martien* v. *Porter (Tax Commission Case)*, 68 Mont. 450, 219 Pac. 817.)

5. The validity of the election is challenged on the ground that the ballot contained a dual question on which the electors could not intelligently vote to express their assent or dissent as to one without including the other.

It is fundamental that a proceeding submitting two questions which are not naturally related in such manner that the elector must vote for or against both is invalid. (*Reid* v. *Lincoln County*, 46 Mont. 31, 125 Pac. 429; 9 R. C. L. 1059; 15 C. J. 618.) However, the proposition to prorate a portion of the funds to be derived from the sale of the bonds to Richey district was a part and parcel of the proposition to issue bonds, which could not be dissociated from the principal provision to issue the bonds for the county high school building; it was so made by the statute, and was necessary to the validity of the bonds if issued at all. The proposal submitted was not, therefore, dual, within the meaning of the above fundamental rule (44 C. J. 1201, note 19; 15 C. J. 619; *Clark* v. *City of Manhattan Beach*, 175 Cal. 637, 1 A. L. R. 1532, 166 Pac. 806; *State ex rel. School District* v. *Gordon*, 223 Mo. 1, 122 S. W. 1008); it was a "single purpose" within the meaning of the term as defined in *State ex rel. Turner* v. *Patch*, 64 Mont. 565, 210 Pac. 748.

Finding no constitutional or statutory provision under which the proposed issue of bonds would be invalidated, the de-

murrer to the application is sustained, the writ denied and the proceeding dismissed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN, concur.