HERRIN, Plaintiff, v. ERICKSON, Governor, et al., De-
fendants.

(No. 6,889.)

(Submitted June 15, 1931. Decided July 6, 1931.)

[2 Pac. (2d) 296.]

· *Mr. E. G. Toomey,* for Plaintiff, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. C. N. Davidson,* Assistant Attorney General, for Defendants, submitted a brief; *Mr. Davidson* argued the cause orally.

*Mr. Howard Toole* and *Messrs. Brown, Wiggenhorn & Davis, Amici Curiae,* submitted an original, a reply and a supplemental brief; *Mr. Toole* and *Mr. Horace S. Davis* argued the cause orally.

## Opinion: PER CURIAM.

This is an action to enjoin the issuance and sale of state bonds to the extent of $2,096,500 under authority of Chapter 126, Laws of 1929, and Chapter 186, Laws of 1931.

Chapter 126 was passed by the legislature, approved by the governor, and ratified by the people at the general biennial election held on November 4, 1930. Section 1 of the Act authorizes and empowers the legislative assembly to direct the state board of examiners to issue bonds in an amount not exceeding $3,000,000 for the purpose of constructing, repairing and equipping necessary buildings, acquiring necessary grounds, and for other permanent improvements at fourteen specified state institutions. Section 2 provides that the bonds shall be issued in series and at such time and in such amount as appears to the legislative assembly to be necessary and for the best interests of the state. Section 3 specifies the time of the maturity of the bonds and their interest rate, and contains this proviso: "and provided further that interest

only shall be paid on said bonds for the first ten (10) years after their issuance, and that thereafter provision shall be made for a sinking fund adequate for the redemption of said bonds pursuant to their terms." By section 4 the state board of examiners is authorized to prescribe the form of the bonds subject to certain requirements therein specifically made. Section 5 prescribes the manner of disposing of the bonds. Section 6 directs that the proceeds from the sale of the bonds shall be paid into the state treasury and be expended for the purposes enumerated in section 1 of the Act. Section 7 provides: "That there shall be levied annually upon all property in the State of Montana subject to taxation an ad valorem tax upon each dollar of the assessed valuation of such property sufficient to pay the interest accruing on said bonds for the first ten (10) years after their issuance, and sufficient thereafter to pay the interest on said bonds and to provide an adequate sinking fund for their redemption. The tax when collected by the county treasurers of the several counties of the state shall be by them accounted to and paid into the state treasury of the State of Montana, and by the state treasurer placed in the 'State Institutions Bond Sinking and Interest Fund,' which fund shall be used exclusively for the payment of the interest on said bonds, and to constitute a sinking fund for their redemption." Section 8 provides for the submission of the Act to the people.

Chapter 186 of the Laws of 1931 authorizes the state board of examiners to issue and sell bonds contemplated by Chapter 126, Laws of 1929, in the aggregate amount of $2,096,500, and allocates to each of the institutions named in Chapter 126 a definite sum of money, and itemizes with particularity the purposes for which the money allocated to each institution shall be expended, and specifies a definite amount of money for each unit of work to be done at each institution.

Plaintiff's right to enjoin the issuance and sale of the bonds is grounded upon the claim that there has been no compliance with section 2 of Article XIII, of the state Constitution, which provides: "The legislative assembly shall not

in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election.''

This section contemplates the borrowing of money for some state purpose, and the repayment thereof by some method of taxation. As applicable to the present situation, it contemplates the creation of a debt, the incurring of a debt, by the legislative assembly upon compliance with certain definite conditions and restrictions, and in consequence contemplates an increase in the rate of taxation for a state purpose. (1) The debt must be created *by a law* which shall be irrepealable until the indebtedness therein provided for shall have been fully paid and discharged; (2) such law shall *specify the purpose* (not purposes) to which the funds so raised shall be applied; (3) and provide for *the levy of a tax* sufficient to pay the interest on, and extinguish the principal of such debt *within the time limited by law* for the payment thereof. If the amount of the debt exceeds $100,000, except in case of war, to repel invasion or suppress insurrection, it must receive the affirmative vote of the people. This being regularly ascertained and declared, the law is operative in all its provisions. The debt is *created* by (1) the Act of the legislative assembly complying in all respects with the constitutional requisites; (2) the approval of the people; (3) the receipt of the money borrowed, for which the state issues its promise, or promises, to pay, usually in the form of bonds, redeemable after a

definite period, and payable at a certain time with interest, as authorized by the law. Necessarily the creation of the debt goes back to the legislative Act.

In *State ex rel. Campbell* v. *Stewart*, 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755, 756, this court had before it an Act appropriating $500,000, "or so much thereof as may be necessary," to aid the United States in prosecuting the war against Germany. It empowered the board of examiners to borrow "any sum not exceeding $500,000" to be used for that purpose, and to issue bonds therefor. The Act made provision for levying a tax, but only for the year 1918. It was held that the Act came within the exception provided for in section 2 of Article XIII, as a war measure, and for that reason did not create a debt within the purview of that section. In that case the court, in speaking of section 2, used this significant language: "The very terms of the section imply and contemplate a specific obligation created by the legislature itself, of such a character that computation will disclose in advance what tax levy is requisite to pay the interest on and to extinguish the debt at its certain maturity."

This statement in the *Campbell Case* correctly interprets section 2 of Article XIII. That section clearly contemplates that the law which requires the approval of the people shall itself create the debt subject to their approval. The legislative power with respect to the debt shall be exhausted by the passage of the law creating it, and, if approved by the people, it passes beyond further legislative control. (*Morton-Bliss Co.* v. *Comptroller*, 4 S. C. (4 Rich.) 430.) The irrepealable law contemplated by the Constitution is one entirely complete in itself and self-executing. It must provide a tax for the retirement of the indebtedness, and nothing is to be left for subsequent legislative discretion. The Act must be and remain inviolate in its provisions until the bonds are completely redeemed. The constitutional requirement is that the law creating the debt shall *specify* (point out) the purpose to which the funds shall be applied. It does not say that such law shall indicate in a general way the purpose

or purposes for which the funds will be used. The Constitution contemplates that such a law shall embrace but a single purpose. (*Hollinger* v. *King*, 282 Pa. 157, 127 Atl. 462, 464; *People ex rel. Hopkins* v. *Board of Supervisors*, 52 N. Y. 556.) This fact was assumed in the case of *State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841.

Furthermore, it was clearly contemplated, and as to this all members of the court agree, that such law shall levy a tax sufficient to pay the interest and principal when due, and not attempt to shift that responsibility to succeeding legislative assemblies. This was to assure protection to bondholders and in so doing to operate as a guaranty to the state that it would obtain a fair market for its bonds. So viewing section 2 of Article XIII, we come then to the question whether Chapter 126 meets with its requirements.

Plaintiff's principal contentions are that Chapter 126 fails to provide for the levy of a sufficient tax, or any tax, as required by this section of the Constitution; that it does not specify the purpose to which the funds shall be applied; and that it does not authorize the creation of a debt but undertakes to delegate to future legislative assemblies that power.

In the first place, does it authorize the creation of a debt, or does it seek to obtain the consent of the people for future assemblies to create one? Measured by the standard prescribed in the *Campbell Case*, it obviously does not create a debt. There is no specific obligation, or any obligation, created until and unless a subsequent legislative assembly shall act on the purported authorization. The amount that is to be borrowed, the amount of the bonds to be issued, the time when the obligation will attach, rest within the discretion of succeeding legislative assemblies; yet, as said in the *Campbell Case*, all are "requisite to the provision demanded by section 2 of Article XIII." Future assemblies are at liberty, under the scheme, to direct the sale of bonds in as little or as great an amount as they desire, subject to the maximum of $3,000,000. Under the terms of the Act, some of the bonds

might not be sold for thirty or even fifty years; they are to be sold only as appears necessary to the legislature.

Now, just what debt have the people authorized? Would the people have voted for the measure had they known that only $250,000 of the authorized amount would be expended within the first two years after the approval of Chapter 126? Would Chapter 126 have been approved by the people if they had known that $2,096,500 of the $3,000,000 authorization would be utilized during the first two years after its passage? These questions but suggest that the law that was submitted to the people does not itself create any debt. It does not advise the people of the contemplated program by which a debt—a specific obligation—is created. It simply is an effort to get authority from the people for future assemblies to create a debt in such amount, not exceeding $3,000,000, and at such time as they see fit. It does not meet the requirement of section 2, Article XIII, as interpreted in the *Campbell Case*. The claim that the case of *State ex rel. Bonner* v. *Dixon*, supra, settles this question in favor of the Act, because there a similar Act was upheld where the specific obligation was not created by legislative Act approved by the people, but where the state board of education was empowered to determine the amount of the bond issue subject to the maximum of $5,000,000, cannot be sustained. The Act there considered, unlike Chapter 126, did not attempt to commit any part of the program to future legislation.

Also, Chapter 126 cannot be upheld for another reason. The Act does not specify, but only indicates in a general way, the purpose to which the funds shall be applied. In *State ex rel. Bonner* v. *Dixon*, supra, this court held an Act valid which, as stated, was very similar to this one, but it is noteworthy that the Act was exclusively for specifically named educational institutions, and did not attempt to include wholly dissociated institutions, such as the state prison, the insane asylum, the tuberculosis sanitarium, or the soldiers' home, as beneficiaries of the fund. That case went the limit in upholding that Act as contemplating a

single purpose. Two members of the court think the *Bonner Case* offended against the Constitution in that respect, but regard it as *stare decisis* as to its subject matter. The addition of the four institutions named in Chapter 126 that were not embraced in the Act in the *Bonner Case* deprives Chapter 126 of the requirement that it relate to a single purpose. Those four institutions are not in any sense educational institutions. Their affairs are not administered by the same officers or boards. Their purposes are wholly unrelated to the purposes of the institutions involved in the *Bonner Case* and which are again commingled in this Act. What possible relation can there be between the college of agriculture and mechanic arts and the insane asylum?

In *State ex rel. Turner* v. *Patch*, 64 Mont. 565, 210 Pac. 748, 750, this court used the following language in defining the words "single purpose": "According to approved usage, then, the words 'single purpose' convey to the mind the idea of one object, project, or proposition—a unit isolated from all others. In other words, to constitute a single purpose, the elements which enter into it must be so related that, when combined, they constitute an entity; something complete in itself, but separate and apart from other objects." And in the case of *State ex rel. Henderson* v. *Dawson County*, 87 Mont. 122, 286 Pac. 125, 133, it was correctly said, in applying this constitutional provision to a single purpose, that "it is fundamental that a proceeding submitting two questions which are not naturally related in such manner that the elector must vote for or against both is invalid."

In considering and applying a similar constitutional limitation in the case of *People ex rel. Hopkins* v. *Board of Supervisors*, 52 N. Y. 556, it is well said: "The Constitution would be of little value as a restraint upon the debt-creating power if it could be evaded by bringing together in one law distinct appropriations of different amounts, for a canal in one part of the state, in aid of a railroad in another, building a lunatic asylum in another, and a state prison and a normal school building in still other parts; and then a debt could be author-

ized for the single object of raising the money to pay the 'said appropriation.' ''

"To 'specify' means 'to mention specifically; state in full and explicit terms; name expressly or particularly.' (Standard Dictionary; *Peters* v. *Banta*, 120 Ind. 416, 22 N. E. 95, 23 N. E. 84, 85.) It is an ordinary word used in common speech and generally understood; it must be given the understanding which the people who voted for the Constitution would give it. (*Collins* v. *Kephart*, 271 Pa. 428, 434, 117 Atl. 440.) 'Specific' is the very opposite of 'general.' (*Smith* v. *McCoole*, 5 Kan. App. 713, 46 Pac. 988, 989.) This Act of assembly is any-thing but specific; it is general in its terms. * * * The Constitution requires that every Act of assembly authorizing the borrowing of money shall specify the purpose, 'and the money so borrowed shall be used for the purpose specified and no other.' To issue bonds under this Act of assembly would be a plain violation of this constitutional provision, be-cause there is no purpose specified by the Act. * * * The Constitution uses the word 'purpose' in the singular, and it requires that the borrowing of money shall be made by an Act of assembly which specifies a single purpose. * * * In brief, we agree that the Constitution demands that every Act which authorizes the creation of a debt shall state dis-tinctly, without reference to other sources of information, a single purpose for which the money is to be borrowed.'' (*Hollinger* v. *King, supra.*)

"No more stringent or judicious provision could be devised to secure to the electors the information necessary to an in-telligent expression of their will, and to enable them to act upon the merits of the proposition unembarrassed and un-disturbed by interests and influences other than those con-nected with the character and importance of the single work or object for which it should be proposed to contract the debt.'' (*People ex rel. Hopkins* v. *Board of Supervisors, supra.*)

The suggestion that the Act can be sustained as providing revenue for a single purpose, to-wit, state buildings, is with-

out merit. In section 5 of Article XIII is a prohibition against the incurring of a county indebtedness ''for any single purpose to an amount exceeding ten thousand dollars ($10,000),'' without approval of the electors. This limitation may not be evaded by dividing the total amount required for a single purpose, into several sums, each less than $10,000, and thus incurring the debt without approval of the electors. (*Hefferlin* v. *Chambers*, 16 Mont. 349, 40 Pac. 787; *Jenkins* v. *Newman*, 39 Mont. 77, 101 Pac. 625.) Is it possible that a county is enjoined from incurring a debt for $6,000 for enlarging its high school building, and at the same time a debt for $5,000 for enlarging its county jail, without approval of the electors on the theory that it is all for a single purpose, viz. county buildings? Is a county prohibited from incurring a debt for $6,000 for the construction of a building at the county fair, and at the same time contracting a debt for $5,000 for improvement of its buildings at the county poor farm without approval of the electors, on the assertion that the purpose is single because relating to county buildings? Does section 5 of Article XIII prohibit the county from improving a building occupied by its sexton in charge of its cemetery operated under section 4514, Revised Codes 1921, to the extent of $2,000, and at the same time authorize the incurring of a debt for $9,000 for improving its courthouse without the favorable vote of the electors, all because the two objects are in fact a single purpose—improvement of county buildings? The questions carry their own negative answers.

The Act before us cannot under any theory be sustained as one specifying a single purpose to which the funds shall be applied. It thus comes into conflict with section 2, Article XIII, and cannot stand.

Also the Act, we think, is void for failure to levy a tax. The command of section 2 of Article XIII is that the law creating the debt shall ''provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal

of such debt within the time limited by such law for the payment thereof.''

A tax levy is a legislative function, and the power to make it cannot be delegated to any administrative board or officer. (Cooley on Taxation, 4th ed., secs. 1012, 1013.) The authority may come from the Constitution which in exceptional cases will provide for the levy of a specific tax, or for a tax for some defined purpose; generally, the legislature is the only body which can levy taxes for state purposes. (Id., sec. 1013.)

Considering the constitutional provision of section 2 in the light of its purpose and specific language, it seems to us that, where an increase in taxation is inevitable if the law is approved, the increase in the rate must be specified so the people may vote advisedly. It cannot be that the Constitution, in view of the specific provision under consideration and related sections, can be held to permit the legislature to fix a tax rate without restriction. That construction would be contrary to the whole spirit of the Constitution. When the law which is to create the debt is submitted to the people, it must give them definite information as to the amount of the debt, the specific purpose for which the money is to be spent, and respecting the tax levy. This last is, if comparison is permissible, the most important of the provisions, for upon it rests the rate of interest to be paid, and the fund which shall extinguish the principal of the debt ''within the time limited by such law for the payment thereof.'' It is essential that the people know to what extent the tax levy for state purposes, otherwise fixed and definite, shall be increased. They might be willing to approve a levy of a mill but averse to a levy of two mills, or five mills. They have a right to know the extent of their additional tax burden.

There is no specification in the law whatsoever as to the amount which shall be levied each year for deposit in the sinking fund. It is entirely possible, within the terms of the Act, to levy a nominal amount during the second decade and to do the same during a portion of the third decade;

then, attempting to levy a sufficient tax to retire the bonds, which might prove practically impossible, we would find the state carrying a huge debt which it would be unable to pay without a Refunding Act. Section 2 of Article XIII of the Constitution is designed to prevent such a possibility.

"A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." (Cooley's Const. Limitations, 7th ed., p. 121, quoted in *State ex rel. Bennett* v. *State Board of Examiners,* 40 Mont. 59, 104 Pac. 1055, 1057.)

As will be seen, the Act in question does no more in legal effect than follow the language of the Constitution. Section 7 says simply "that there shall be levied annually upon all property in the State of Montana subject to taxation an *ad valorem* tax upon each dollar of the assessed valuation of such property sufficient to pay the interest accruing on said bonds for the first ten (10) years after their issuance, and sufficient thereafter to pay the interest on said bonds and to provide an adequate sinking fund for their redemption." Levied by whom, and in what amount?

As well might it be said that compliance with section 12 of Article XII, containing similar language with reference to the tax levy, may be had by Act of the legislative assembly simply copying the words of the Constitution in the Act. There cannot be any imposition of a tax without the rate or amount being fixed. An undetermined tax is no tax, as this court, quoting from Cooley on Taxation, said in *State ex rel. Bennett* v. *State Board of Examiners,* supra. Under this law the rate has not been fixed and the amount has not been fixed. The amount is simply $3,000,000, which may or may not become an indebtedness, depending upon the sale of the bonds. Furthermore, as the court said in the *Bennett Case:* "The legislature is the only body that can fix the rate

of taxation within the limitations declared. The rates mentioned are merely the limits beyond which the legislature cannot go. To leave it to the Board of Equalization to say whether or not taxes shall be collected at this or that rate would be a delegation of legislative power to that board. The legislature cannot delegate its power to any person or body of persons whomsoever (*State* v. *Holland,* 37. Mont. 393, 96 Pac. 719); and hence, the fixing of the rate being a legislative function, the Board of Equalization could not lawfully be clothed with authority to determine the rate upon any contingency whatsoever.''

The scheme provides that interest shall be paid on each bond from the date of its issuance for ten years, and then there is to be an additional tax for a sinking fund; but there is no limitation whatever upon the amount of the levy. It is argued that the legislative assembly may be expected to levy an adequate tax each year. The answer is that, if the rate of the tax levy is to be fixed by succeeding legislatures, the Act is void. To this all members of the court agree. Suppose the legislature did have the power to fix the rate; the terms of the Act permit the sale of these bonds at indeterminate periods; it is possible to withhold the sale of some of them until after the expiration of thirty or even fifty years. But, if all are sold within thirty years from the year 1931, but at different periods, there will be different dates of issuance, different dates when the bonds are redeemable and payable, and different levies for the sinking fund; in short, the tax levy would vary, and might vary greatly during the life of the bonds. The tax must be levied by the legislature, and necessarily the amount to be levied would be in its discretion.

But the legislature cannot fix the rate. It can only levy the rate fixed by the law, and the law has not fixed it.

It is argued that, in view of the case of *State ex rel. Lyman* v. *Stewart,* 58 Mont. 1, 190 Pac. 129, wherein similar language was held to constitute a levy, Chapter 126 is sufficient in this respect. But in the *Lyman Case* the Act, unlike Chapter

126, did fix a maximum rate of taxation. It was urged in that case by counsel seeking to uphold the Act that the maximum rate became the controlling rate until a sufficient amount was raised to discharge the principal and interest, and that not until then was it subject to change, at which time it should be discontinued altogether. The opinion in that case does not disclose whether this view was adopted by the court. On the basis that the Act there considered did fix a definite rate, the Act was properly upheld, otherwise not.

There are cases which hold that language similar to that used in section 7 of this Act is sufficient to constitute the levy of a tax, particularly where administrative officers are empowered and authorized, either by the Act itself or by existing laws, to fix the rate. Among them may be cited: *Morton-Bliss Co.* v. *Comptroller*, 4 S. C. 430; *City of Boise City* v. *Union Bank & Trust Co.*, 7 Idaho, 342, 63 Pac. 107; *Pettibone* v. *West Chicago Park Commrs.*, 215 Ill. 304, 74 N. E. 387; *Howland* v. *Board of Supervisors*, 109 Cal. 152, 41 Pac. 864; *Allen* v. *Cromwell*, 203 Ky. 836, 263 S. W. 356; *Pelo* v. *Stevens*, 66 Misc. Rep. 35, 120 N. Y. Supp. 227. We have a statute (sec. 2149, Rev. Code 1921) which attempts to confer that authority upon the state board of equalization, but whether that section can be upheld in view of what was said in the *Bennett Case* need not here be considered.

It is plain from a reading of all of Chapter 126 that it was the intention of the framers of that Act not to make provision for the levy of a tax in the Act itself, but to commit that responsibility to future legislative assemblies. It simply makes a promise that provision will be made in the future for creating a sinking fund. That is made plain by section 3 of the Act, which provides: "And provided further that interest only shall be paid on said bonds for the first ten (10) years after their issuance, and that *thereafter* provision shall be made for a sinking fund adequate for the redemption of said bonds pursuant to their terms." The word *"thereafter"* has reference to a time after ten years have elapsed from the date of the issuance of the bonds. The legislative assembly has

apparently construed the Act as we have, for by Chapter 185, Laws of 1931, it has made a levy of five-twelfths of a mill for the years 1931 and 1932.

It is well to call to mind the fact that all prior laws of this character have specified the rate of taxation in unmistakable terms, with the possible exception of *State ex rel. Lyman* v. *Stewart,* supra.

The city and county cases cited, wherein Acts similar to this one have been held to levy a tax, are not authority in support of the claim that this Act does so. City and county officers may be compelled by mandamus to make the proper levy. But the legislative assembly may not be controlled by mandamus. And in none of the cases cited do we find language such as appears in section 3 of Chapter 126, which indicates indubitably that the intention of the framers of the Act was to have future legislative assemblies—not an administrative board—make provision for a sinking fund to retire the bonds.

In attempting to delegate to future legislative assemblies the duty of creating a sinking fund, the Act violates the provisions of section 2, Article XIII. One of the most important elements required by that section to be irrepealable is the provision for the levy of a tax sufficient to discharge the debt at its maturity. The entire scheme contemplated by Chapter 126 was to procure an indefinite authorization from the people that future legislative assemblies might work out all the details of the debt about to be created, and make provision for its payment. This was attempted by Chapters 185 and 186, Laws of 1931. But the Constitution requires the law creating the debt and providing for the levy of a tax to discharge it shall have the approval of the people. It is the complete law, protected from legislative change or modification, that the people were called upon to approve or disapprove, not the question whether authority should be given the legislature to do something in the future, to supply what is left uncertain in the law. In adopting the Constitution, the people placed limitations upon themselves as well as upon the legislature.

"Where a legislative Act is attacked on the ground of its ▮ unconstitutionality, the question presented is not whether it is possible to condemn it, but whether it is possible to uphold it, the presumption being in favor of its validity, and it must be upheld unless its unconstitutionality appears beyond a reasonable doubt. (*Martien* v. *Porter*, 68 Mont. 450, 219 Pac. 817; *State ex rel. Diederichs* v. *State Highway Com.*, 89 Mont. 205, 296 Pac. 1033.)" (*Arps and Cottle* v. *State Highway Com.*, ante, p. 152, 300 Pac. 549, 557.)

As was correctly stated in the case last above cited (the ▮ *Highway Debenture Case*), "the function of the judiciary is to give effect to the legal acts of the legislature, not to supervise them. (*Myrick* v. *Peet*, 56 Mont. 13, 180 Pac. 574.)" However, where there is a plain violation of constitutional mandates, it is the duty of the court to apply the constitutional restrictions which the people have placed upon themselves, irrespective of the expediency or desirability of upholding any legislative enactment. If we declare the Act in question—indefinite, uncertain, and without specific time limit, without any provision except the fiat "there shall be levied an adequate tax"—within the provisions of section 2, that section of the Constitution may as well be relegated to the realm of forgotten things.

As we said in *State ex rel. Diederichs* v. *State Highway Commission*, supra: "We have reached this decision with a due sense of its great importance and only after a faithful effort to sustain the law." The language therein following that sentence need not be repeated, but is as appropriate to this case as it was to that.

It follows that the injunction prayed for must issue, and it is so ordered.

MR. JUSTICE FORD: I am unable to agree with the views expressed by my associates. In my opinion, Chapter 126, Laws of 1929, is not unconstitutional.

That the Act specifies but a single purpose is settled by prior decisions of this court. In the case of *State ex rel. Bonner*

v. *Dixon,* 59 Mont. 58, 195 Pac. 841, 847, the court had before it for consideration Initiative Measure No. 19, passed by the people in November, 1920, which provided for the construction and equipment of buildings at the four state institutions of higher education, together with the State Orphans' Home, School of Deaf and Blind, Industrial School, and Vocation School for Girls, all located in different parts of the state, and the same objection was raised to that measure as here. After a careful consideration of the question, the court determined that the law specified but a single purpose. While it is true that reference was made to the fact that all of the institutions enumerated in that Act were under the supervision of the state board of education, as I read the decision, that was not the controlling factor, for it is said: "In the title of the Act in question there is but one subject namely, the issuance and sale of bonds by the state for buildings and betterments of certain state institutions. The objection is without merit."

In *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, Ann. Cas. 1918D, 1101, 171 Pac. 755, 756, it was held that an Act authorizing the state to borrow money "for the purpose of encouraging, aiding and assisting those engaged in agricultural pursuits, in procuring seed, in planting, sowing, raising and harvesting crops, and in procuring labor and assistance necessary for such purposes, for the purpose of encouraging, aiding and assisting farmers and stock growers in procuring live stock and for feed for the same, and in raising live stock, and in procuring labor and assistance necessary for such purposes, and for the purpose of transporting and aiding and assisting in the transportation and marketing of crops and live stock, * * * and for all other purposes public exigencies may require for the support, aid and assistance of the United States in carrying on and prosecution of such war," and for repelling invasion and suppressing insurrection, did not transgress the constitutional provision relating to a single purpose.

In *Arps and Cottle v. State Highway Com.*, ante, p. 152, we held that Chapter 95, Laws of 1931 (State Highway Debenture Law), which authorized the issuance and sale of state highway debentures ''for the purpose of assuring the ability of the state to secure any funds or moneys allocated and made available to it by the Acts of Congress in reference to the construction, betterment, and maintenance of highways, and to provide additional working funds for the state highway commission'' of the state of Montana in reference to the roads and highways of the state, specified but a single purpose.

''The rule of interpretation now quite generally adopted is that, if all parts of the statute have a natural connection and can reasonably be said to relate, directly or indirectly, to one general and legitimate subject of legislation, the Act is not open to the charge that it violates this constitutional provision; and this is true, no matter how extensively or minutely it deals with the details looking to the accomplishment of the main legislative purpose.'' (*Evers v. Hudson*, 36 Mont. 135, 92 Pac. 462, 465.)

Here all parts of the Act under consideration have a natural connection, and reasonably relate ''to one general and legitimate subject of legislation,'' namely, ''the construction, repair, and equipment of necessary buildings, other permanent improvements, and the acquisition of necessary grounds therefor'' at the state institutions enumerated.

The provision of section 7 of Chapter 126, supra, that ''there shall be levied annually upon all property in the State of Montana subject to taxation an *ad valorem* tax upon each dollar of the assessed valuation of such property sufficient to pay the interest accruing on said bonds, * * * to provide an adequate sinking fund for their redemption,'' fills the full purpose of section 2, Article XIII of our Constitution. ''The phrase, 'There shall be levied annually,' etc., is the phrase commonly employed in Acts which do 'provide for the levy of a tax.' '' (*State ex rel. Lyman v. Stewart*, 58 Mont. 1, 190 Pac. 129, 132.) ''When the legislature declares that a tax 'shall be levied,' the direct sense of the terms imports a com-

mand rather than a promise, if it is possible for these words to operate effectually as a command. * * * These words are capable of full efficacy as a command, inasmuch as the standing tax laws afford all the means requisite to enable the tax to be completed as an administrative act. They must, therefore, be construed as commanding such acts, as, under the standing tax laws, are requisite for the imposition and enforcement of the tax in question. * * * The declaration of the fact that a tax was levied sufficient to pay interest estops and precludes the denial of such fact as effectually as if the statute was cast in the form of a command, so that an executive officer who should refuse to perform a duty dependent on the fact thus declared would be compelled to contradict the express declaration of the statute in order to excuse his want of due compliance. This cannot be. * * * If the language in question may be read as intending nothing beyond a mere declaration of an intent on the part of the legislature to provide at some future time or times, by suitable enactments, for the levying of an annual tax to pay interest, and as communicating no authority that would warrant the executive officers in proceeding to make the imposition of the tax effectual, then it might with propriety be said that that which the Constitution intended had not been accomplished by the legislature. Comparing this language with the Constitution, it becomes clear that the legislature could have no motive to depart from the requirements of the Constitution such as a court of justice would be at liberty to impute to that body. To say that they intended non-conformity to the Constitution would be to charge dishonesty of motive, when the necessary bearing of such action on the rights of the bondholder is considered. We cannot admit such an assumption in the construction of this language. The primary and ordinary sense of the words used imports a command of something to be done, which is fully understood when we look into the standing tax laws." (*Morton-Bliss Co.* v. *Comptroller*, 4 S. C. 430. See, also, *Link* v. *Karb*, 89 Ohio St. 326, 104 N. E. 632.)

The fact that the rate of levy is not specified is not fatal to the Act. It does provide a maximum, i. e., a rate sufficient to pay interest and to provide an adequate sinking fund, and this is the express mandate of the Constitution.

A careful reading of the case of *State ex rel. Lyman* v. *Stewart*, supra, demonstrates beyond doubt that this question has been determined adversely to the views expressed by the court here. In that case the constitutionality of Chapter 150, Laws of 1917, was questioned upon the identical grounds with those here considered. That Act authorized the establishment of a terminal elevator, and the issuance and sale of state bonds to pay the cost thereof. Section 4 provided that the net proceeds received from the storage of grain in the elevator should be turned into the state treasury, to the credit of a fund designated "Terminal Elevator Fund," and should be used exclusively for the payment of principal and interest on the bonds issued, and, if the money so paid into such fund "is not sufficient to pay the semi-annual interest on the bonds and the redemption thereof, then and in that event there shall be levied annually not exceeding one-half (½) of a mill on the dollar * * * which said tax when collected by the county treasurer shall be accounted for and paid over to the state treasurer to be by the state treasurer held in the 'Terminal Elevator Fund,' which fund shall be used exclusively for the payment of the interest on such bonds and for the redemption thereof."

Upon comparison of Chapter 150, supra, and Chapter 126, supra, it is apparent that the *exact rate* of levy in either case is uncertain, if we speak as of the date of the enactment of the laws. Under section 4, quoted above, and approved by this court, it is not known what millage up to one-half of a mill would actually be required or fixed from year to year; under Chapter 126, supra, it was not possible to determine the dates when the institutional bonds would be actually issued, and the rate could not be fixed with any degree of certainty, and therefore it was not known when the two Acts were passed what rate would be required to produce a sum sufficient to

pay the interest and discharge the bonds within the time fixed by the Acts. Any rate which would not produce that amount would fall short of the constitutional requirement.

Under the plan provided for by Chapter 126, which finds approval in the *Bonner Case,* the bonds are to be issued and sold as the needs of the state institutions demand. How could the legislature determine, not knowing when the bonds would be issued, the taxable value of the property in the state at the time of issuance, or the rate of interest at which the money could be borrowed, and fix a definite rate of levy?

Clearly, the provisions of section 7, supra, are more certain than those of section 4, supra, and the rate of levy may be more readily determined under section 7 than under the provisions of section 4, supra. The case of *State ex rel. Bennett* v. *State Board of Examiners,* 40 Mont. 59, 104 Pac. 1055, cited in the court's opinion, is not in point here. In that case the law in effect authorized the state board to determine the amount of revenue to be raised, and the court correctly held that the power to *levy* a tax could not be delegated to that board, while here the Act levies the tax and the determination of the rate is a clerical act to be performed by an administrative board. When read in the light of the questions under consideration, the *Bennett Case* does not in any manner conflict with the views I have expressed.

Nor does the fact that the legislature of 1931 levied a tax to pay the interest on the bonds authorized to be issued under Chapter 186, Laws of 1931, indicate that the legislature interpreted Chapter 126 as not levying a tax. My investigation discloses that in each and every instance where an Act authorizing the issuance of state bonds fixes a definite tax levy, each subsequent legislature has by separate Act levied the tax authorized by such Act. For example, Initiative Measure 19, supra, expressly levied an annual tax of ten-twelfths of a mill; yet each legislature since the passage of the Act has annually levied the tax. So, with reference to the levy by the legislature of 1931, that body only adopted the practice followed by prior legislatures.

Chapter 126 does not transgress any constitutional provision; it provides for the levy of a tax sufficient to pay the interest upon and retire the bonds; the determination of the rate of levy is a clerical function to be performed by the state board of equalization (sec. 2149, Rev. Codes 1921), and that board could be compelled to perform its duty by mandamus. This section does not attempt to confer power of levying a tax upon the board of equalization, and is constitutional. (*Houghton* v. *Austin*, 47 Cal. 646; *San Francisco & N. P. R. R. Co.* v. *State Board*, 60 Cal. 12.)

Rehearing denied September 9, 1931.